# NORTHWEST AIRLINES, INC., ET AL. *v.* COUNTY OF KENT, MICHIGAN, ET AL.

No. 92–97.   Argued November 29, 1993—Decided January 24, 1994

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. THOMAS, J., filed a dissenting opinion, *post*, p. 374. BLACKMUN, J., took no part in the consideration or decision of the case.

*Walter A. Smith, Jr.,* argued the cause for petitioners. With him on the briefs was *Jonathan S. Franklin.*

*William F. Hunting, Jr.,* argued the cause for respondents. With him on the brief were *Mark S. Allard, Robert A. Buchanan,* and *Michael M. Conway.*

*Edward C. DuMont* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Wallace, William Kanter, Christine N. Kohl, Paul M. Geier,* and *Dale C. Andrews.**

---

*Briefs of *amici curiae* urging reversal were filed for the Air Transport Association of America by *Mary E. Downs;* for Thrifty Rent-A-Car System, Inc., by *Randall J. Holder* and *Nancy Glisan Gourley;* and for the

JUSTICE GINSBURG delivered the opinion of the Court.

Seven commercial airlines, petitioners in this case, assert that certain airport user fees charged to them are unreasonable and discriminatory, in violation of the federal Anti-Head Tax Act (AHTA), 49 U. S. C. App. § 1513, and the Commerce Clause. Because the record, as it now stands, does not warrant a judicial determination that the fees in question are unreasonable or unlawfully discriminatory, we affirm the judgment of the Court of Appeals.

I

A

The user fees contested in this case are charged by the Kent County International Airport in Grand Rapids, Michigan. The Airport is owned by respondent Kent County and operated by respondents Kent County Board of Aeronautics and Kent County Department of Aeronautics (collectively,

---

American Trucking Associations, Inc., by *Andrew L. Frey, Andrew J. Pincus, Daniel R. Barney,* and *Robert Digges, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the State of New Hampshire et al. by *Jeffrey R. Howard,* Attorney General of New Hampshire, and *Monica A. Ciolfi,* Assistant Attorney General, *Grant Woods,* Attorney General of Arizona, *Daniel E. Lungren,* Attorney General of California, *Robert A. Butterworth,* Attorney General of Florida, *Bonnie J. Campbell,* Attorney General of Iowa, *Michael E. Carpenter,* Attorney General of Maine, *Frank J. Kelley,* Attorney General of Michigan, *Joseph P. Mazurek,* Attorney General of Montana, *Frederick P. DeVesa,* Acting Attorney General of New Jersey, *Heidi Heitkamp,* Attorney General of North Dakota, *Mark Barnett,* Attorney General of South Dakota, and *James E. Doyle,* Attorney General of Wisconsin; for the City of Los Angeles by *James K. Hahn, Gary R. Netzer, Breton K. Lobner, Steven S. Rosenthal,* and *Anthony L. Press;* for the Aircraft Owners and Pilots Association by *John S. Yodice;* for the Airports Council International-North America by *Patricia A. Hahn;* for the American Association of Airport Executives by *Scott P. Lewis;* for the National Business Aircraft Association, Inc., et al. by *Raymond J. Rasenberger;* and for the U. S. Conference of Mayors et al. by *Richard Ruda.*

the Airport). Petitioners are seven commercial airlines serving the Airport (the Airlines).

The Airport collects rent and fees from three groups of users: (1) commercial airlines, including petitioners; (2) "general aviation," *i. e.*, corporate and privately owned aircraft not used for commercial, passenger, cargo, or military service; and (3) nonaeronautical concessionaires, including car rental agencies, the parking lot, restaurants, gift shops, "rent-a-cart" facilities, and other small vendors. Since 1968, the Airport has allocated its costs and set charges to aircraft operators pursuant to a "cost of service" accounting system known as the "Buckley methodology."[1] This system is designed to charge the Airlines only for the cost of providing the particular facilities and services they use.[2]

Under its accounting system, the Airport first determines the costs of operating the airfield and the passenger terminal, and allocates these costs among the users of the facilities. Costs associated with airfield operations (*e. g.*, maintaining the runways and navigational facilities) are allocated to the Airlines and general aviation in proportion to their use of the airfield. No portion of these costs is allocated to the concessions. Costs associated with maintaining the airport terminal are allocated among the terminal tenants— the Airlines and the concessions—in proportion to each tenant's square footage.[3]

The Airport then establishes fees and rates for each user group. It charges the Airlines 100% of the costs allocated to them, in the form of aircraft landing and parking fees (for use of the airfield), and rent (for the terminal space the Air-

---

[1] See James C. Buckley, Rental Fee Recommendations (Feb. 1969), App. 223–275.

[2] In contrast, "residual cost" accounting systems base rates and fees on the total cost of operating the airport. See Brief for City of Los Angeles as *Amicus Curiae* 5.

[3] The parking lot is owned and operated by the Airport itself and is not material to this dispute.

lines occupy).[4]  General aviation, however, is charged at a lower rate.  The Airport recovers from that user group a per gallon fuel flowage fee for local aircraft and a landing fee for aircraft based elsewhere.  These fees account for only 20% of the airfield costs allocated to general aviation.

In relation to costs, the Airport thus "undercharges" general aviation.  At the same time, measured by allocated costs, the Airport vastly "overcharges" the concessions. The Airlines pay a cost-based per square foot rate for their terminal space.  The concessions, however, pay market rates for their space.[5]  Market rates substantially exceed the concessions' allocated costs and yield a sizable surplus.[6] The surplus offsets the general aviation shortfall of approximately $525,000 per year, and has swelled the Airport's reserve fund by more than $1 million per year.

## B

Using the "Buckley methodology" just described, the Airlines and the Airport periodically negotiated and agreed upon fees to be charged through December 31, 1986.  Following a new rate study made in 1986, the Airport proposed increased fees beginning January 1, 1987.  App. 193 (Plaintiffs' Exh. 6).  The Airlines objected to the higher fees and failed to reach an agreement with the Airport.  Ultimately, the County Board of Aeronautics adopted an ordinance unilaterally increasing the fees.[7]  On the effective date of

---

[4] The Airlines are also charged for the cost of providing "crash, fire, and rescue" services, and amortization fees for assets acquired by the Airport.

[5] Most concessions pay 10% of their gross receipts as rent for space.

[6] For example, the Airport's annual net revenues from 1987 to 1989 ranged from approximately $1.6 million to $1.9 million.  App. 278–279 (Plaintiffs' Exhs. 301 and 355).

[7] The ordinance increased aircraft landing fees by $.20 per thousand pounds, and increased terminal rent charges by $6.67 per square foot for prime heated and air-conditioned space, $.59 per square foot for nonprime air-conditioned space, and $1.84 per square foot for nonprime, heated, non-air-conditioned space.  The ordinance also decreased aircraft parking fees by $.12 per thousand pounds.  738 F. Supp. 1112, 1115 (WD Mich. 1990).

the ordinance, April 1, 1988, the Airlines sued the Airport, primarily challenging post-December 31, 1986, rates. The Airlines attacked (1) the Airport's failure to allocate to the concessions a portion of the airfield costs, (2) the surplus generated by the Airport's fee structure, and (3) the Airport's failure to charge general aviation 100% of its allocated airfield costs. These features, the Airlines alleged, made the fees imposed on them unreasonable and thus unlawful under the AHTA, as added, 87 Stat. 90, and as amended, 49 U. S. C. App. § 1513, and the Airport and Airway Improvement Act of 1982 (AAIA), 96 Stat. 686, as amended, 49 U. S. C. App. § 2210. The Airlines also asserted that the Airport's treatment of general aviation discriminates against interstate commerce in favor of primarily local traffic, in violation of the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3.

The parties filed cross-motions for summary judgment. In the first of three opinions, the District Court denied the motions, holding that the Airport's cost methodology is not *per se* unreasonable. App. to Pet. for Cert. 57. In its second opinion, the District Court held that the Airlines have an implied right of action to challenge the fees under the AHTA but not under the AAIA, and that the Airlines have no cause of action under the Commerce Clause. *Id.*, at 42–46. Following a bench trial, the District Court issued its third and final opinion, concluding that the challenged fees are not unreasonable under the AHTA. 738 F. Supp. 1112 (WD Mich. 1990).

The Court of Appeals for the Sixth Circuit affirmed the District Court's judgment in principal part. 955 F. 2d 1054 (1992). In accord with the District Court, the Court of Appeals held that the AHTA impliedly confers a private right of action on the Airlines, but the AAIA does not. *Id.*, at 1058. On the merits, the Court of Appeals (1) upheld as reasonable under the AHTA the bulk of the charges that the Airport imposes on the Airlines, and (2) rejected the Air-

lines' dormant Commerce Clause claim on the ground that the AHTA regulates the area. *Id.*, at 1060–1064.

On one matter, however, the Court of Appeals reversed the District Court's judgment and remanded the case. The District Court had upheld as reasonable under the AHTA the Airport's decision to allocate to the Airlines 100% of the costs of providing "crash, fire, and rescue" (CFR) services. 738 F. Supp., at 1119. Emphasizing that the CFR facilities service all aircraft, not just the Airlines, the Court of Appeals held that the Airport must allocate CFR costs between the Airlines and general aviation. 955 F. 2d, at 1062–1063, 1064.

Petitioning for this Court's review, the Airlines challenged the Court of Appeals' adverse rulings on the AHTA and Commerce Clause issues. The Airport did not cross-petition for review of the Sixth Circuit's judgment to the extent that it favored the Airlines; specifically, the Airport did not petition for review of the remand to the District Court for allocation of the costs of CFR services between the Airlines and general aviation. We granted certiorari, 508 U. S. 959 (1993), to resolve a conflict between the decision under review and a decision of the Court of Appeals for the Seventh Circuit, *Indianapolis Airport Authority* v. *American Airlines, Inc.*, 733 F. 2d 1262 (1984), which declared key parts of a similar fee structure unreasonable under the AHTA.

II

A

In *Evansville-Vanderburgh Airport Authority Dist.* v. *Delta Airlines, Inc.*, 405 U. S. 707 (1972), this Court held that the Commerce Clause does not prohibit States or municipalities from charging commercial airlines a "head tax" on passengers boarding flights at airports within the jurisdiction, to defray the costs of airport construction and maintenance. We stated in *Evansville:* "At least so long as the toll is based

on some fair approximation of use or privilege for use, . . . and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users." *Id.*, at 716–717.

Concerned that our decision in *Evansville* might prompt a proliferation of local taxes burdensome to interstate air transportation, Congress enacted the AHTA. See *Aloha Airlines, Inc.* v. *Director of Taxation of Haw.*, 464 U. S. 7, 9–10 (1983) (summarizing history of AHTA's enactment); S. Rep. No. 93–12, p. 4 (1973) (Congress intended AHTA to "ensure . . . that local 'head' taxes will not be permitted to inhibit the flow of interstate commerce."); *id.*, at 17 ("The head tax . . . cuts against the grain of the traditional American right to travel among the States.").

The AHTA provides in pertinent part:

"(a) Prohibition; exemption

"No State (or political subdivision thereof . . .) shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom . . . .

"(b) Permissible State taxes and fees

"[N]othing in this section shall prohibit a State (or political subdivision thereof . . .) from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and nothing in this section shall prohibit a State (or political subdivision thereof . . .) owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other

service charges from aircraft operators for the use of airport facilities." 49 U. S. C. App. § 1513.

Primarily, the Airlines urge that the Airport's fees overcharge them in violation of the AHTA. Before reaching that issue, however, we face a threshold question. The United States as *amicus curiae* and, less strenuously, the Airport, urge that the Airlines have no right to enforce the AHTA through a private action commenced in a federal court of first instance. Instead, they maintain, complaints under the AHTA must be pursued initially in administrative proceedings before the Secretary of Transportation, subject to judicial review in the courts of appeals.

The threshold question is substantial: If Congress intended no right of immediate access to a federal court under the AHTA, then the Airlines' AHTA claim should have been dismissed, not adjudicated on the merits as it was, indeed in part favorably to the Airlines. However, the Airport filed no cross-petition for certiorari seeking to upset the judgment to the extent that it rejected the Airport's CFR cost allocation (100% to the Airlines) as inconsonant with the AHTA. For that reason, we decline to resolve the private right of action question in this case.

A prevailing party need not cross-petition to defend a judgment on any ground properly raised below, so long as that party seeks to preserve, and not to change, the judgment. See, *e. g., Thigpen* v. *Roberts*, 468 U. S. 27, 29–30 (1984). A cross-petition is required, however, when the respondent seeks to alter the judgment below. See, *e. g., Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 119, n. 14 (1985); *United States* v. *New York Telephone Co.*, 434 U. S. 159, 166, n. 8 (1977); *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 560, n. 11 (1976); *United States* v. *ITT Continental Baking Co.*, 420 U. S. 223, 226–227, n. 2 (1975). Alteration would be in order if the private right of action question were resolved in favor of the Airport. For then, the entire judgment would be undone, including

the portion remanding for reallocation of CFR costs between the Airlines and general aviation. The Airport's failure to file a cross-petition on the CFR issue—the issue on which it was a judgment *loser*—thus leads us to resist the plea to declare the AHTA claim unfit for District Court adjudication.[8]

The question whether a federal statute creates a claim for relief is not jurisdictional. See *Air Courier Conference* v. *Postal Workers*, 498 U. S. 517, 523, n. 3 (1991); *Burks* v. *Lasker*, 441 U. S. 471, 476, n. 5 (1979); *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 278–279 (1977); *Bell* v. *Hood*, 327 U. S. 678, 682 (1946). Accordingly, we shall assume, solely for purposes of this case, that the alleged AHTA private right of action exists.

## B

The AHTA prohibits States and their subdivisions from levying a "fee" or "other charge" "directly or indirectly" on "persons traveling in air commerce or on the carriage of persons traveling in air commerce." 49 U. S. C. § 1513(a). Landing fees, terminal charges, and other airport user fees of the sort here challenged fit § 1513(a)'s description. As we confirmed in an opinion invalidating a state tax on airlines' gross receipts, § 1513(a)'s compass is not limited to direct "head" taxes. *Aloha Airlines*, 464 U. S., at 12–13.

But § 1513(a) does not stand alone. That subsection's prohibition is immediately modified by § 1513(b)'s permission. See *Wardair Canada Inc.* v. *Florida Dept. of Revenue*, 477

---

[8] *Berkemer* v. *McCarty*, 468 U. S. 420, 435, n. 23 (1984), is not to the contrary. There the Court of Appeals had reversed the respondent's criminal conviction, holding postarrest incriminating statements inadmissible under *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Because he prevailed in the Court of Appeals, obtaining a judgment entirely in his favor, respondent could not have filed a cross-petition. Accordingly, his contention that certain prearrest statements (whose admissibility the Court of Appeals had left ambiguous) were inadmissible was a permissible argument in defense of the judgment below.

U. S. 1, 15–16 (1986) (Burger, C. J., concurring in part and concurring in judgment) (§ 1513(b)'s saving clause was enacted in response to the States' concern that § 1513(a)'s "sweeping provision would prohibit even unobjectionable taxes such as landing fees . . ."). Sections 1513(a) and (b) together instruct that airport user fees are permissible only if, and to the extent that, they fall within § 1513(b)'s saving clause, which removes from § 1513(a)'s ban "reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities."[9]

While § 1513(b) allows only *"reasonable* rental charges, landing fees, and other service charges," the AHTA does not set standards for assessing reasonableness. Courts, we recognize, are scarcely equipped to oversee, without the initial superintendence of a regulatory agency, rate structures and practices. See *Colorado Interstate Gas Co.* v. *FPC,* 324 U. S. 581, 589 (1945) ("Rate-making is essentially a legislative function."); cf. *Far East Conference* v. *United States,* 342 U. S. 570, 574 (1952) ("in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over").[10] The Secretary of Transportation is

---

[9] The Airport's argument, accepted by the dissent, that user fees are entirely outside the scope of the AHTA because they are not "head" taxes, advances an untenable reading of the statute. We note, in this regard, § 1513(b)'s recognition, in its first clause, of "taxes *other than those enumerated in subsection (a) of this section,* including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services" (emphasis added). Unlike the property and income taxes listed in the first clause of § 1513(b), the airport user fees listed in § 1513(b)'s second clause are *not* described as taxes "other than those enumerated in subsection (a)." The statute, in sum, is hardly ambiguous on this matter: User fees are covered by § 1513(a), but may be saved by § 1513(b).

[10] The reasonableness of the Airport's rates might have been referred, prior to any court's consideration, to the Department of Transportation under the primary jurisdiction doctrine. That doctrine is "specifically ap-

charged with administering the federal aviation laws, including the AHTA.[11] His Department is equipped, as courts are not, to survey the field nationwide, and to regulate based on a full view of the relevant facts and circumstances. If we had the benefit of the Secretary's reasoned decision concerning the AHTA's permission for the charges in question, we would accord that decision substantial deference. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–845 (1984). Lacking guidance from the Secretary, however, and compelled to give effect to the statute's use of "reasonable," we must look elsewhere.

The parties point to the standards this Court employs to measure the reasonableness of fees under the Commerce Clause, as stated in the *Evansville* case, see *supra*, at 362–363; they invite our use of the *Evansville* standards as baselines for determining the reasonableness of fees under the

---

plicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency" and permits courts to make a "'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter* v. *Cooper*, 507 U. S. 258, 268 (1993). However, as the parties have not briefed or argued this question, we decline to invoke the doctrine here.

[11] The Federal Aviation Act, which encompasses the AHTA, authorizes the Secretary of Transportation to conduct investigations, issue orders, and promulgate regulations necessary to implement the statute. See 49 U. S. C. App. § 1354(a). The Act provides a mechanism for administrative adjudication, subject to judicial review in the courts of appeals, of alleged violations. See § 1482(a) ("[a]ny person may file with the Secretary of Transportation . . . a complaint in writing with respect to anything done or omitted to be done by any person in contravention of any provisions of [the Act], or of any requirement established pursuant thereto"); § 1486 (judicial review provision). The Secretary has established procedures for adjudicating such complaints through the Federal Aviation Administration, see 14 CFR pt. 13 (1993), and the FAA has entertained challenges to the reasonableness of airport landing fees under the AHTA. See *New England Legal Foundation* v. *Massachusetts Port Authority*, 883 F. 2d 157, 159–166 (CA1 1989).

AHTA.[12]  We accept the parties' suggestions.  Although
Congress enacted the AHTA because it found unsatisfactory
the end result of our Commerce Clause analysis in *Evans-
ville*—the validation of "head" taxes—Congress specifically
permitted, through § 1513(b)'s saving clause, "reasonable
rental charges, landing fees, and other services charges." [13]
The formulation in *Evansville* has been used to determine
"reasonableness" in related contexts.  See, *e. g., American
Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 289–290
(1987) (applying *Evansville* test to assess validity under
Commerce Clause of state taxes applied to interstate motor
carrier); *Massachusetts* v. *United States*, 435 U. S. 444, 466–
467 (1978) (applying *Evansville* test to determine constitu-
tionality of tax under intergovernmental immunity doctrine).
It will suffice for the purpose at hand.[14]

---

[12] See Brief for Petitioners 20, 22–23; Reply Brief for Petitioners 3–4;
Brief for Respondents 32; see also Brief for United States as *Amicus
Curiae* 23–29 (arguing that *Evansville* reasonableness test is satisfied
without explicitly endorsing its application).

[13] Contrary to the dissent's suggestion, applying *Evansville*'s standards
to determine whether airport fees are "reasonable" under § 1513(b) would
not permit airports to "impos[e] a modest per passenger fee on airlines as
a service charge for use of airport facilities." *Post*, at 380.  Section
1513(a)'s prohibition is written broadly, whereas § 1513(b) is narrow, saving
only "reasonable rental charges, landing fees, and other service charges."
A per passenger service charge would be an impermissible "head charge"
under § 1513(a), and does not fit into any of the three categories saved by
§ 1513(b).  The user fees challenged here, by contrast, are "rental charges,
landing fees, and other service charges," § 1513(b), that would be prohib-
ited as "fee[s]" or "other charge[s]" under § 1513(a), unless they are "rea-
sonable."  See *supra*, at 365–366.

[14] It remains open to the Secretary, utilizing his Department's capacity
to comprehend the details of airport operations across the country, and the
economics of the air transportation industry, to apply some other formula
(including one that entails more rigorous scrutiny) for determining
whether fees are "reasonable" within the meaning of the AHTA; his expo-
sition will merit judicial approbation so long as it represents "a permissible
construction of the statute." *Chevron U. S. A. Inc.* v. *Natural Resources
Defense Council, Inc.*, 467 U. S. 837, 842–845 (1984).

To recapitulate, a levy is reasonable under *Evansville* if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce. 405 U. S., at 716–717. The Airlines contend that the Airport's fee structure fails the *Evansville* test on three main counts. We consider each contention in turn.

1

As noted above, the Airport allocates its air-operations costs between the Airlines and general aviation; the concessions in fact supply the lion's share of the Airport's revenues, see *supra*, at 360, but are allocated none of these costs. The Airlines contend that the concessions benefit substantially, albeit indirectly, from air operations, because those operations generate the concessions' customer flow. Therefore, the Airlines urge, the Airport's failure to allocate to the concessions any of the airfield-associated costs violates *Evansville*'s requirement that user fees be "based on some fair approximation of use or privilege for use." 405 U. S., at 716–717. The cost reallocation sought by the Airlines would not change the market-based rent paid by the concessions, see *supra*, at 360, but it would lower the charges imposed on the Airlines.

We see no obvious conflict with *Evansville* in the Airport's allocation of the costs of air operations to the Airlines and general aviation, but not to the concessions. Only the Airlines and general aviation actually use the runways and navigational facilities of the Airport; the concessions use only the terminal facilities. The Airport's decision to allocate costs according to a formula that accounts for this distinction appears to "reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." 405 U. S., at 716–717.[15]

---

[15] See also 405 U. S., at 718–719 (airports may lawfully distinguish among classes of users, including aircraft operators and concessions, based on their differing uses of airport facilities); *Denver v. Continental Air Lines,*

The District Court found that (with one minor exception [16]) the Airport charged the Airlines "the break-even costs for the areas they use." 738 F. Supp., at 1119.[17] In this light, we cannot conclude that the Airlines were charged fees "excessive in comparison with the governmental benefit conferred." *Evansville, supra,* at 717. See also Brief for United States as *Amicus Curiae* 25 ("As long as an airport's charges to air carriers do not result in revenues that exceed by more than a reasonable margin the costs of servicing those carriers, the Secretary would normally sustain those charges as reasonable under federal law.") (citing Federal Aviation Administration, *Airport Compliance Requirements,* Order No. 5190.6A §§ 4–13, 4–14, pp. 20–22 (Oct. 2, 1989), and 14 CFR § 399.110(f) (1993)).

2

The Airlines also contend that the Airport's fee methodology is unlawful because, by imposing on the Airlines virtu-

_____

*Inc.,* 712 F. Supp. 834, 838, 839 (Colo. 1989) (rejecting a similar argument, noting: "Nothing in the history and purpose of the Anti-Head Tax Act indicates that Congress intended the courts to act as a public utility commission and intervene in the setting of airport rates and charges through the adoption or rejection of any particular type of cost accounting methodology. Denver's division of costs and revenues between airlines and concessionaires is facially a reasonable approach to establishing rental charges, terminal rates, landing fees and other service charges which are collected from the users of the facilities at Stapleton [Airport].").

[16] The District Court found that the Airport overcharged the Airlines for aircraft parking and ordered the Airport "to recalculate this fee to result in a true break-even charge." 738 F. Supp., at 1120. The Airport did not appeal this order.

[17] The Airlines do not dispute that they are charged only their allocated share of the airfield and terminal costs. They assert, however, that the Airport has allocated to them excessive "carrying charges" or amortization fees for capital improvements. The Court of Appeals specifically addressed and rejected this contention, concluding that the rate charged "is reasonable and should not result in a net present value which exceeds the initial cost of the [capital improvements] project." 955 F. 2d 1054, 1063 (CA6 1992). We have no cause to disturb that determination.

ally all of the air-operations costs, and exacting fees from the concessions far in excess of their allocated costs, the methodology generates huge surpluses. The AHTA, however, does not authorize judicial inquiry focused on the amount of the Airport's surplus. The statute requires only that an airport's fees not "be excessive in relation to costs incurred by the taxing authorities" for benefits conferred on the user. *Evansville, supra,* at 719. As we have explained, the Airlines are charged only for the costs of benefits they receive. The Airport's surplus is generated from fees charged to concessions, and the amounts of those fees are not at issue. As the Court of Appeals pointed out, § 1513(b) applies only to fees charged to "aircraft operators." 955 F. 2d, at 1060.

The Airlines urge us to consider the effect of the concession revenues when deciding whether the fees charged the Airlines are reasonable, pointing to the Seventh Circuit's analysis in *Indianapolis Airport* v. *American Airlines, Inc.,* 733 F. 2d, at 1268 (invalidating the Indianapolis Airport's fee structure on the ground, *inter alia,* that the Airport's generation of a surplus from the concession fees indirectly raised the costs of air travel). The Seventh Circuit, however, overlooked a key factor. It reasoned explicitly from the incorrect premise that "[n]o agency has regulatory authority over the rate practices of the Indianapolis Airport Authority." *Ibid.* The Seventh Circuit panel believed that "the duty of regulation [fell] to the courts in the enforcement of the state and federal statutes forbidding unreasonable rates." *Ibid.* That court thought it necessary to "imagine [itself] in the role of a regulatory agency." *Ibid.* In contrast, our opinion in this case emphasizes that the Department of Transportation has regulatory authority to enforce the federal aviation laws, including the AHTA and the AAIA, see *supra,* at 366–367, and n. 11, so there is no cause for courts to offer a substitute for "conventional public utility regulation," 733 F. 2d, at 1268.

We resist inferring a limit on airport surpluses from the AHTA for a further reason. That measure does not mention surplus accumulation, but another statute, the AAIA, directly addresses the use of airport revenues. The AAIA requires that "*all* revenues generated by the airport . . . be expended for the capital or operating costs of the airport . . . ." 49 U. S. C. App. § 2210(a)(12) (emphasis supplied). The Airlines do not suggest that the Airport is using its surplus for any purpose other than Airport-related expenses, nor did they seek review of the lower courts' holding that they had no right of action under the AAIA. 955 F. 2d, at 1058–1059. For these reasons, even if the AAIA is read to impose a limit on the accumulation of surplus revenues, see Brief for United States as *Amicus Curiae* 26–27, the question whether the Airport's surpluses are excessive is not properly before us.

3

Finally, the Airlines contend that the Airport's fees discriminate against them in favor of general aviation, in violation of *Evansville*'s instruction that airport tolls be nondiscriminatory regarding interstate commerce and travel. As earlier recounted, see *supra*, at 359–360, the Airlines pay 100% of their allocated costs while general aviation users are assessed fees covering only 20% of their allocated costs.

We need not consider whether the Airlines would have a compelling point had they established that general aviation is properly categorized as intrastate commerce. Cf., *e. g.*, *Chemical Waste Management, Inc.* v. *Hunt*, 504 U. S. 334, 339–348 (1992) (invalidating state fee on hazardous wastes generated outside, but disposed of inside, the State, because it discriminated against interstate commerce); *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S., at 268–269 (invalidating state highway use taxes because they discriminated against interstate motor carriers). The record in this case, it suffices to say, does not support the Airlines' argument. We cannot assume, in the total absence of proof, that

the large and diverse general aviation population served by the Airport travels typically intrastate and seldom ventures beyond Michigan's borders.[18]

### III

The Airlines assert that, even if the Airport's user fees are not unreasonable under the AHTA, they violate the "dormant" Commerce Clause. Even if we considered the AHTA's express permission for States' imposition of "reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities," 49 U. S. C. App. § 1513(b), insufficiently clear[19] to rule out judicial dormant Commerce Clause analysis,[20] petitioners' argu-

---

[18] The Airlines suggest that they had no opportunity to develop a record demonstrating discrimination in favor of intrastate carriers, because the District Court granted summary judgment for respondents on the Commerce Clause question. See Reply Brief for Petitioners 9–10, n. 14. This argument does not fly. The case did proceed to trial on the AHTA claim. The Airlines have asserted that *Evansville*'s standard governs AHTA reasonableness. Thus, under their own theory, they had to demonstrate the equivalent of a violation of the dormant Commerce Clause—*i. e.*, discrimination against interstate commerce—in order to prevail at the AHTA trial. The Airlines' belated suggestion—which contradicts their endorsement of *Evansville*, see Brief for Petitioners 22–23—that discrimination in favor of intrastate commerce is relevant under the Commerce Clause, but not under the AHTA, is unimpressive. The AHTA was a direct response to *Evansville;* Congress' principal concern in enacting the measure was to proscribe fees that unduly burden interstate commerce. See, *e. g.*, S. Rep. No. 93–12, p. 17 (1973). Covered fees, as we have emphasized, include, but are not limited to, head taxes. See *supra*, at 365–366, and n. 9.

[19] See, *e. g.*, *Wyoming* v. *Oklahoma*, 502 U. S. 437, 458 (1992) (requiring that Congress "manifest its unambiguous intent before a federal statute will be read to permit" state regulation discriminating against interstate commerce).

[20] See, *e. g.*, *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 154 (1982) ("Once Congress acts, courts are not free to review state taxes or other regulations under the dormant Commerce Clause. When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the

ment would fail. We have already found the challenged fees reasonable under the AHTA through the lens of *Evansville*—that is, under a reasonableness standard taken directly from our dormant Commerce Clause jurisprudence.

\* \* \*

For the reasons stated, and without prejudging the outcome of any eventual proceeding before or regulation by the Secretary of Transportation, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE BLACKMUN took no part in the consideration or decision of this case.

JUSTICE THOMAS, dissenting.

Today the Court transforms a statutory prohibition on a narrow class of charges on air travel into a broad mandate for federal regulation and review of virtually all airport fees. I disagree with the Court that the landing fees, rental charges, and carrying charges challenged here fall within the scope of the Anti-Head Tax Act (AHTA or Act), 49 U. S. C. App. § 1513. Unlike the Court, I do not believe that the Act imposes a "reasonableness" requirement on all airport charges and user fees. Instead, the Act merely prohibits fees, taxes, and charges imposed on the bases specified in § 1513(a), and leaves airports free to impose other charges, subject to the restrictions of the dormant Commerce Clause. Because the Act does not apply to the fees at issue in this case, I would remand for consideration of petitioners' Commerce Clause claim. Accordingly, I respectfully dissent.

I

As the Court recognizes, *ante,* at 362–363, Congress passed the AHTA in response to this Court's decision in

_____

courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action.").

*Evansville-Vanderburgh Airport Authority Dist.* v. *Delta Airlines, Inc.*, 405 U. S. 707 (1972), which upheld against Commerce Clause challenge the imposition of a per capita ("head") tax on air travelers. The Act was designed primarily to deal with the proliferation of local head taxes in the wake of the *Evansville* decision. *Aloha Airlines, Inc.* v. *Director of Taxation of Haw.*, 464 U. S. 7, 9, 13 (1983).

Two AHTA provisions are relevant here. Section 1513(a) prohibits state and local governments from imposing "a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom." Section 1513(b), however, states that "nothing in [the Act]" prohibits the imposition of "taxes other than those enumerated in subsection (a)," including, among other things, property and net income taxes, and that the Act does not prohibit "reasonable rental charges, landing fees, and other service charges" collected from "aircraft operators for the use of airport facilities."

In the Court's view, § 1513(a) prohibits virtually all airport user fees, *ante*, at 365 ("Landing fees, terminal charges, and other airport user fees of the sort here challenged fit § 1513(a)'s description"), and § 1513(b) "saves" those fees that are "reasonable," *ante*, at 366, n. 9 ("[U]ser fees are covered by § 1513(a), but may be saved by § 1513(b)"). The Court supports its broad reading of § 1513(a) in part by noting that the section prohibits not only head taxes but also taxes on gross receipts. *Ante*, at 365 (citing *Aloha Airlines*, 464 U. S., at 12–13). That, however, merely states the obvious. Section 1513(a) expressly prohibits taxes "on the gross receipts derived" from the sale of air transportation. The mere fact that the Act is not strictly limited to head taxes, which were the Act's primary target, *id.*, at 13, but also encompasses taxes on gross receipts from the sale of air trans-

portation, in no way suggests that the Act should be read to encompass all airport "user fees."

To be sure, the Act's apparently broad ban on any fees, taxes, or charges imposed "directly or *indirectly,* on persons traveling in air commerce," etc., superficially supports the Court's interpretation. Any cost an airline bears is in some sense an "indirect" charge "on persons traveling in air commerce," because the airline ultimately will pass that cost on to consumers in the form of higher ticket prices. But if § 1513(a) covers all charges indirectly imposed on air travelers, as the Court apparently believes, see *ante,* at 365, it should logically encompass all taxes imposed on airlines as well, including property taxes, net income taxes, franchise taxes, and sales and use taxes on the sale of goods and services. Yet § 1513(b) instructs that such taxes are not covered by § 1513(a)—that they are "taxes *other than those enumerated in subsection (a)."* (Emphasis added.) Significantly, § 1513(b) is not phrased as an exemption for taxes otherwise within § 1513(a)'s prohibition, but rather as a clarification of the reach of § 1513(a). It makes clear that the language of § 1513(a) defining the prohibition does not extend by its own force to the taxes enumerated in § 1513(b). Under the Court's broad construction of § 1513(a)'s "directly or indirectly" language, however, the two provisions would appear to be in conflict.

Recognizing the significance of § 1513(b)'s treatment of taxes, the Court implicitly acknowledges that § 1513(a) does not cover the taxes listed in § 1513(b). *Ante,* at 366, n. 9. But the Court can only accomplish this reading by assuming that § 1513(b) treats the "rental charges, landing fees, and other service charges . . . for the use of airport facilities" listed in that subsection differently from the enumerated taxes. In this understanding, while as to taxes § 1513(b) merely clarifies the scope of § 1513(a), as to fees it serves the altogether different function of providing an exemption from § 1513(a)'s prohibition. The Court supports this reading on

the ground that § 1513(b) does not explicitly describe the fees as distinct from ("other than") the fees prohibited in § 1513(a). That construction requires a rather unlikely reading of § 1513(a), however, because it means that the same language defining the scope of the prohibition in that section inexplicably would have one meaning when applied to fees, and quite a different (and more limited) meaning when applied to taxes. None of the taxes listed in § 1513(b), although borne indirectly by airline passengers, would constitute a "tax, fee, . . . or other charge, [levied] directly or indirectly, on persons traveling in air commerce," etc. But a user fee charged to an airline, *because* it is borne indirectly by airline passengers, would constitute such a "tax, fee, . . . or other charge . . . ." Thus, the prohibition in § 1513(a) would not extend to, for example, property taxes, because they are not imposed on one of the bases listed in § 1513(a), but would extend to other fees or charges, regardless of the basis upon which they are imposed.

Adherence to the plain language of § 1513(a) avoids these problems. In my view, when the statute prohibits a tax or charge "on persons traveling in air commerce," "on the carriage of" such persons, "on the sale of air transportation," or "on the gross receipts derived therefrom," it defines the prohibition in terms of the prohibited *basis* of the tax or charge. That is, § 1513(a) prohibits the levy or collection of a tax or fee "on" certain subjects. A head tax, for example, is a charge "on persons traveling in air commerce" in that it is imposed on a per passenger basis. A landing fee, by contrast, is not—rather, it is a charge on an aircraft's landing at an airport, without regard to the number of passengers it carries.[1]

---

[1] Of course, as the Court notes, *ante*, at 366, n. 9, user fees such as landing fees are not *per se* excluded from the Act. An airport could not, for example, simply replace a head tax, which is clearly forbidden by the Act, with a "landing fee" calculated according to the number of passengers on an airplane. Such a thinly disguised substitute for a head tax no doubt

Section 1513(b) confirms that § 1513(a) is concerned with the basis on which the tax or charge is calculated. Property taxes, net income taxes, and franchise taxes are not imposed on one of the bases prohibited in § 1513(a), and as explained above, are not included in § 1513(a). Because the same language in § 1513(a) restricts taxes as well as fees and other charges, it seems logical that the fees referred to in § 1513(b), which also are not generally calculated on the bases listed in § 1513(a), are similarly beyond § 1513(a)'s prohibition.

Section 1513(b)'s reference to "reasonable" charges, then, does not impose a requirement that all airport user fees be "reasonable." Instead, it simply makes clear that state and local governments remain free to impose charges other than those proscribed by § 1513(a). Cf. *Aloha Airlines*, 464 U. S., at 12, n. 6 ("Section 1513(a) pre-empts a limited number of state taxes, . . . [and] [§]1513(b) clarifies Congress' view that the States are still free to impose on airlines and air carriers 'taxes other than those enumerated in subsection (a)'"). That is not to say that the term "reasonable" is superfluous. Had the Act made unqualified reference to landing fees and other user fees, it might have been read as an indication of congressional intent to authorize fees or charges that would otherwise be invalid under the dormant Commerce Clause. See *Maine* v. *Taylor*, 477 U. S. 131, 139 (1986). An unqualified reference might have also been understood to permit landing fees and other fees calculated on one of the bases prohibited by § 1513(a). See n. 1, *supra*. By including the term "reasonable," Congress ensured that the Act would not

is a charge on the carriage of passengers traveling in air commerce within the meaning of § 1513(a). A landing fee is not such a prohibited charge where it is based merely on the weight of an airplane, as here. See App. 194 (Plaintiffs' Trial Exh. 6: Fees for the Use of Public Aircraft Facilities and Rental for Passenger Terminal Premises, Kent County International Airport, Three Years Beginning Jan. 1, 1987 (Dec. 31, 1986)). Similarly, neither a rental fee based on square footage, see *ibid.*, nor a carrying charge based on the depreciation of an asset, see App. 68–70 (trial testimony of Richard K. Dompke), is such a prohibited charge.

be understood to displace the dormant Commerce Clause or to exempt user fees on aircraft operators *per se* from § 1513(a). In short, § 1513(b) merely clarifies that fees, taxes, and other charges not encompassed within § 1513(a) may be imposed if consistent with our dormant Commerce Clause jurisprudence.[2]

## II

The considerable difficulty the Court has in finding content for the term "reasonable" should signal that Congress did not intend the Act to impose a comprehensive new regulation on airport fees. As the Court admits, the Act itself sets no standards for reasonableness. *Ante,* at 366. Finding no other source for a definition, the Court uses *Evansville* as its test of reasonableness, apparently for want of anything better. See *ante,* at 367–368. The Court seems to recognize that this is not a perfect fit (but "will suffice for the purpose at hand," *ante,* at 368), and with good reason. Reasonableness was only one of several factors considered in *Evansville;* nondiscrimination against interstate commerce is a separate concern and is of at least equal importance. See 405 U. S., at 716–717. Moreover, as the Court acknowledges, Congress enacted the Act precisely because it found the result in *Evansville* "unsatisfactory." *Ante,* at 368.

Nevertheless, the Court reads the *Evansville* standard into the statute for no reason other than that the parties invite us to do so and that this Court (after enactment of the AHTA) occasionally has applied *Evansville* to test reasonableness in other contexts. *Ante,* at 367–368. That the parties agree on a standard, however, does not mean that it is the correct one. Moreover, it seems somewhat odd to import into the Act the very standard that created the problem Congress ostensibly intended the Act to "correct." Indeed, read as the Court construes it, the Act would fail to prohibit

---

[2] Other statutory restrictions might also apply to the fees at issue here, see, *e. g.,* 49 U. S. C. App. § 2210, but their applicability is not before us.

precisely the sort of fees § 1513(a) most clearly forbids. A head tax itself was held to be a "reasonable" user fee in *Evansville* (assuming, as the Court does, that *Evansville* applied a "reasonableness" standard). Under the Court's interpretation of the AHTA, there is nothing to prevent an airport from imposing a modest per passenger fee on airlines as a service charge for use of airport facilities.[3] Such a fee would pass muster under *Evansville,* and therefore would be "saved" by § 1513(b) as a "reasonable" fee, even though it is clearly a charge "on the carriage of persons traveling in air commerce." § 1513(a).[4] It is doubtful that Congress intended the AHTA to prohibit "unreasonable" landing fees, whatever they might be, while permitting *"Evansville-reasonable"* per capita user fees on aircraft operators. If, as the Court implies, Congress disapproved of the result but not the analysis in *Evansville,* it seems far more likely that it would have left the Commerce Clause analysis undisturbed while prohibiting head taxes and similar fees. In my view, that is precisely what § 1513 does.

Having applied a construction of "reasonable" that it admits is not compelled by the Act, the Court invites the Secretary of Transportation to devise a different, presumably bet-

---

[3] Presumably, under the Court's analysis, § 1513(b) would not save head taxes exacted directly from passengers because it refers only to user fees collected "from aircraft operators."

[4] It is no answer to say, as the Court does, *ante,* at 368, n. 13, that "head charges" are prohibited by § 1513(a). In the Court's view, "user fees are [also] covered by § 1513(a)." *Ante,* at 366, n. 9. As the Court construes the Act, charges covered by § 1513(a) are permitted only if they are "saved" by § 1513(b). *Ibid.* It is not clear why § 1513(b) would save reasonable "fee[s]" and "other charge[s]" covered by § 1513(a) but not reasonable "head charge[s]" covered by § 1513(a). Head charges certainly may constitute "reasonable . . . service charges from aircraft operators for the use of airport facilities," § 1513(b), if *Evansville* is the standard of reasonableness. See *Evansville-Vanderburgh Airport Authority Dist.* v. *Delta Airlines, Inc.,* 405 U. S. 707, 710, 714 (1972) (upholding a $1 per passenger "service charge" collected from air carriers for "use of runways and other airport facilities").

ter, interpretation of the term, to which the Court will defer if it is a permissible construction of the Act.[5]  *Ante*, at 368, n. 14.  Given that the Act sets no standards for "reasonableness," *ante*, at 366, it is difficult to imagine how the Secretary's interpretation could be an impermissible one.  Indeed, although the Court seems to assume that the standard would be at least as rigorous as the one it applies here, presumably the Secretary could, in the exercise of his expertise, devise a more permissive standard.  Under the Court's analysis, there is no reason to assume that the *Evansville* standard is a minimum.  If the Act imposes the comprehensive regulation of the reasonableness of airport charges that the Court sees, it would certainly constitute a clear expression of Congress' intention to displace the dormant Commerce Clause in this area, see *Maine* v. *Taylor*, 477 U. S., at 139, in which case the Secretary would be free to regulate either more or less restrictively than would the dormant Commerce Clause.  Cf. *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 154 (1982).  I simply find nothing in the AHTA that gives the Secretary such unbridled discretion to regulate all airport user fees.

## III

Because the AHTA does not, in my view, apply to the fees in this case, it does not foreclose petitioners' challenge under the dormant Commerce Clause.[6]  The courts below, how-

---

[5] The Secretary of Transportation has not so far promulgated any regulatory standards for judging reasonableness under the Act.  Although that fact is not directly relevant to our inquiry, it is surprising, if the Act means what the Court thinks it does, that the Secretary has not done so in the 20 years since the AHTA's enactment.

[6] Nor, in my view, does the Airport and Airway Improvement Act of 1982 (AAIA), 49 U. S. C. App. § 2210, foreclose dormant Commerce Clause analysis here.  Although the AAIA places a variety of conditions on federal funding of airports, some of which relate to user fees, it imposes no flat prohibitions, and therefore does not make "'unmistakably clear'" that it is intended to displace the dormant Commerce Clause.  *Maine* v. *Taylor*, 477 U. S. 131, 139 (1986).  Moreover, this Court in *Evansville* held

ever, held that the Act, as they interpreted it, precluded that claim. 955 F. 2d 1054, 1063–1064 (CA6 1992); No. G88–243 CA (WD Mich., Jan. 19, 1990), App. to Pet. for Cert. 46a. Because the lower courts should be given the opportunity to consider the merits of petitioners' dormant Commerce Clause challenge in the first instance, I would remand.

I therefore respectfully dissent.

that the AAIA's predecessor, which was substantially similar to the AAIA, did not preclude dormant Commerce Clause analysis. See 405 U. S., at 721.