148 F.3d 1142
 331 U.S.App.D.C. 288
 AIR CANADA, et al., Petitioners,
v.
DEPARTMENT OF TRANSPORTATION and Rodney E. Slater, Secretary
of Transportation, Respondents,
Dade County, Florida and American Airlines, Inc., Intervenors.
 Nos. 97-1274, 97-1284.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 13, 1998.
Decided July 31, 1998.
As Amended Sept. 24, 1998.
 
 [331 U.S.App.D.C. 290] On Petitions for Review of an Order of the Department of Transportation.
 Stephen M. Shapiro argued the cause for petitioners, with whom Kenneth S. Geller, Roy T. Englert, Jr., Timothy S. Bishop, Joel Stephen Burton, Stephen P. Sawyer, Mary McGuire Voog and Lawrence M. Nagin were on the briefs.
 Thomas L. Ray, Senior Trial Attorney, U.S. Department of Transportation, argued the cause for respondents, with whom Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and Marion L. Jetton, Attorneys, Nancy E. McFadden, General Counsel, U.S. Department of Transportation, and Paul M. Geier, Assistant General Counsel, were on the brief.
 Alvin B. Davis, William K. Hill, James H. Burnley, IV, and John R. Keys, Jr. were on the brief for intervenor American Airlines, Inc. Karen L. Grubber entered an appearance.
 Thomas R. Devine, Charles A. Spitulnik, Michael M. Conway, Ross E. Kimbarovsky and Thomas P. Abbott and Gail P. Fels, Assistant County Attorneys, Dade County, Florida, were on the brief for intervenor Dade County Florida.
 Scott P. Lewis and Kenneth W. Salinger were on the brief for amicus curiae Airports Council International--North America. Patricia A. Hahn entered an appearance.
 Before: HENDERSON, ROGERS and GARLAND, Circuit Judges.
 ROGERS, Circuit Judge:
 
 
 1
 Six airlines ("Carriers") petition for review of two Department of Transportation[331 U.S.App.D.C. 291] ("Department" or "DOT") orders[1] investigating and approving the fees charged by Dade County, Florida, at Miami International Airport ("MIA").[2] The essential dispute focuses on the reasonableness of fees that the County increased to cover the cost of MIA renovations and allocated according to an established equalization methodology. The Carriers contend that the Department failed to apply the correct standard of reasonableness, relied on findings unsupported by substantial evidence, made arbitrary and capricious decisions, erroneously placed the burden of proving unreasonableness on the Carriers, and denied the Carriers due process by assigning this burden in mid-proceeding without affording the Carriers an opportunity to present additional evidence. Because the Department applied valid and ascertainable legal standards and based its decision on substantial evidence and valid reasoning, and because the agency proceeding essentially continued the Carriers' lawsuit in which they had the burden of proof and the Carriers can point to no prejudice resulting from the assignment or its timing, we deny the petitions.
 
 I.
 
 2
 Section 511 of the Airport and Airway Improvement Act of 1982 requires airports that receive federal grants for development projects to charge "reasonable" fees. See 49 U.S.C. § 47107 (1994); Air Transp. Ass'n of America v. DOT, 119 F.3d 38, 39 (D.C.Cir.), amended by 129 F.3d 625 (D.C.Cir.1997). In addition, the Anti-Head Tax Act authorizes publicly owned airports to collect only "reasonable" fees from airlines. See 49 U.S.C. § 40116(e)(2) (1994); Air Transp. Ass'n, 119 F.3d at 39. Traditionally, an airline could request an investigation by the Federal Aviation Administration ("FAA") into potential violations of these reasonableness requirements, but the FAA faced no deadline for initiating an investigation or making a final determination and taking appropriate enforcement action. See 14 C.F.R. §§ 13.1, 13.3, 13.5 (1998); see, e.g., New England Legal Found. v. Massachusetts Port Auth., 883 F.2d 157, 159-60 (1st Cir.1989). Before 1994, the Department was not required to issue standards for determining the reasonableness of fees and did not do so. See Air Transp. Ass'n, 119 F.3d at 39-40; see also Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355, 366-67 & n. 11, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994).
 
 
 3
 To provide an expedited process and guidelines for resolving reasonableness disputes, Congress enacted Section 113 of the Federal Aviation Administration Authorization Act of 1994, directing the Secretary of Transportation ("Secretary")[3] to determine whether an airport fee is reasonable upon an airport's request or an airline's complaint. See 49 U.S.C. § 47129(a), (c) (1994). Consequently, airlines now have two administrative options for challenging the reasonableness of airport fees--traditional investigation by the FAA or expedited determination by the Secretary--while airports have only the latter option. Section 113 also directs the Secretary to publish "final regulations, policy statements, or guidelines" establishing both procedures for acting on a request or complaint and standards for determining reasonableness, id. § 47129(b), but the section neither amends the Airport and Airway Improvement Act of 1982 or the Anti-Head Tax Act nor defines "reasonable."
 
 
 4
 In June 1996, in compliance with Section 113, the Secretary published the Policy Regarding Airport Rates and Charges ("Policy [331 U.S.App.D.C. 292] Statement"), 61 Fed.Reg. 31994 (1996). As relevant here, paragraph 2.6 of the Policy Statement permits an airport to "use any reasonable methodology to determine [non-airfield] fees, so long as the methodology is justified and applied on a consistent basis." Id. at 32020-21 p 2.6. Paragraphs 2.1 and 3.1 require an airport to apply its rate-setting methodology consistently to, respectively, "similarly situated" and "comparable" aeronautical users.[4] Id. at 32019 p 2.1, 32021 p 3.1. Subsequently, this court vacated certain portions of the Policy Statement, including paragraph 2.6, because the Department had not justified its decision to treat non-airfield fees (such as terminal fees) differently from airfield fees. See Air Transp. Ass'n, 119 F.3d at 41-45, amended by 129 F.3d at 625. While reserving judgment on whether paragraph 2.6 satisfies the Section 113 requirement that the Secretary publish reasonableness standards, see id. at 41, the court suggested that it does not:
 
 
 5
 The Secretary's "guideline" seems to be missing a "line." The regulation merely states that any reasonable methodology will serve as a basis for non-airfield fees. That concept does not seem to add much--if anything--to the statutory requirement that airport fees be reasonable.
 
 Id. at 41. The court added:
 
 6
 [The Policy Statement] provides no real guidance as to how the Secretary will determine reasonableness.... [H]is regulation surely is inadequate under the [Administrative Procedure Act].
 
 
 7
 Id. at 43.
 
 
 8
 Against the statutory and regulatory backdrop before this court vacated portions of the Policy Statement, Dade County sought to increase MIA fees in order to finance a ten-year, $4.6 billion Capital Improvement Program ("CIP"). See Decl. of Guillermo Carreras 1. The improvements planned in the CIP include adding another runway and dual taxiways, doubling the size of the terminal building, increasing the number of gates, adding moving sidewalks, improving Concourses E, F, G, and H, building a new Concourse J, and reconfiguring Concourses A through D from a layout that resembles four spokes on a wheel to a design featuring one long, linear A/D Concourse for the use of American Airlines, Inc. ("American"). See Decl. of Gary J. Dellapa 6-11. American operates a hub at MIA and, together with its commuter affiliate, carries 51% of the airport's passengers; the next largest carrier is United Air Lines, Inc. ("United"), which handles but 6.24% of MIA's passengers. See Decl. of John Van Wezel 4. The A/D Concourse is designed to handle efficiently American's large passenger load. Furthermore, based on an agreement with Dade County, American will have exclusive use of the A/D gates so long as it averages 250 jet flights per day.[5]
 
 
 9
 The County plans to include nearly all CIP costs in the terminal fees paid by all airlines, and to allocate the costs according to an equalization methodology developed by a committee that included American, Delta Airlines, Inc. ("Delta") and U.S. Airways, Inc. ("USAir"). Under this methodology, used by MIA since 1990, fees for terminal space used exclusively by a single airline, such as ticket counters, are based on square footage without regard to age or condition of the particular space, while fees for facilities and services shared by airlines, such as baggage claim and concourse areas, are based on the number of aircraft seats carried by each airline. See JOHN F. BROWN COMPANY, INC., DADE COUNTY, FL, OVERVIEW OF AIRLINE RATES AND CHARGES 7 (1994). Fees allotted by square footage account for approximately 20% of all terminal fees, while those allotted by number of seats account for 80%. See Test. of Daniel M. Kaspar, Tr. 1306. Allocated this way, the costs of CIP improvements to the terminal building will be pooled and divided proportionally among all airlines at [331 U.S.App.D.C. 293] MIA, such that each airline will inevitably pay for improvements to some facilities and services that it does not use. See Decl. of Van Wezel 14-15. Dade County will except from the pooled costs, however, the costs of certain facilities used by only one airline; for instance, American will pay for an enhanced baggage sorting system dedicated to its exclusive use. Because most fees are proportional to passenger traffic, and American carries more than half of MIA's passengers, American currently pays 40.7% of MIA airline fees and would pay 46.5% under Dade County's proposed new fee schedule under the CIP. See Decl. of Kaspar 5.
 
 
 10
 In September 1995, the Carriers, minus Lufthansa German Airlines, asked the United States District Court for the Southern District of Florida for a declaratory judgment that Dade County's proposed fees are unreasonable in violation of the Anti-Head Tax Act, because the cost of the A/D Concourse[6] will be borne by all airlines even though only American will use the facility unless it reduces or ends its service. See Air Canada, Inc. v. Dade County, No. 95-2037-CIV-LENARD, slip. op. at 2 (D.Fla. Nov. 7, 1996) (order on motions for summary judgment). The district court ruled that "determination of the reasonableness of the fees charged carriers by airport proprietors is properly made by the FAA," id. at 12, granted Dade County's motion to refer the determination of reasonableness to the FAA, id. at 21-22, and directed the parties to "take appropriate action pursuant to 49 U.S.C. § 47129," id. at 22, even though that statute pertains to determinations by the Secretary rather than by the FAA.[7] Accordingly, Dade County filed a request for determination of reasonableness by the Secretary under 49 U.S.C. § 47129, while the Carriers filed a complaint with the FAA under 14 C.F.R. § 13.5. See Miami Int'l Airport Rates Proceeding, No. OST-96-1965, DOT Order 96-12-23, at 10-11 (Dec. 19, 1996) [hereinafter "Instituting Order"].
 
 
 11
 In the first order under review ("Instituting Order"), the Department decided that the reasonableness of MIA's fees should be determined by the Secretary under 49 U.S.C. § 47129 rather than by the FAA under 14 C.F.R. § 13.5.[8] See Instituting Order at 17-18. The Department assigned the dispute to an administrative law judge for a hearing and, consistent with 14 C.F.R. §§ 302.605(a), 302.607(b) (1998), which require the requesting and answering parties to set forth all arguments and evidence in their initial submissions to the Secretary, directed the administrative law judge to confine the hearing to the specific issues and evidence already submitted, allowing additional evidence to be submitted "only for good cause shown." Id. at 23. In addition, the Department limited the scope of the proceedings in certain ways, including by directing the administrative law judge
 
 
 12
 not [to] determine whether the equalization method is inherently reasonable since the airlines do not challenge it, nor ... whether the A/D Concourse is desirable or necessary.... The question in this proceeding instead is whether the airport's allocation of the costs of that project is reasonable.
 
 
 13
 Id. at 24-25. The Department also directed the administrative law judge to "follow the Policy Statement in determining whether the fees are reasonable" because no party challenged its applicability to the dispute. Id. at 25.
 
 
 14
 [331 U.S.App.D.C. 294] Concluding that American should pay a larger share of the costs of the A/D Concourse, the administrative law judge found the fees related to the CIP and A/D Concourse to be unreasonable. The administrative law judge also determined that Dade County had the burden of proving reasonableness, although finding that "even if the burden of proof were on the ... Carriers, ... the preponderance of reliable and probative evidence establishes that the application of the [equalization] methodology to [the A/D Concourse] is unfair and unreasonable." Miami Int'l Airport Rates & Charges, No. OST-96-1965, Recommended Decision of A.L.J. 22 (served Feb. 17, 1997) ("ALJ Decision").
 
 
 15
 Both sides sought review, and in the second order under review ("Final Order"), the Department rejected many of the administrative law judge's key findings. See Miami Int'l Airport Rates Proceeding, No. OST-96-1965, DOT Order 97-3-26 (Mar. 19, 1997) [hereinafter "Final Order"]. All parties agreed that the Department should apply the reasonableness standards embodied in the Policy Statement,[9] specifically paragraphs 2.1, 2.6, and 3.1, and the Department concluded that the fees affected by the CIP and A/D Concourse would be reasonable under those standards.[10] See Final Order at 1. Although noting that "the practices of other airports are not necessarily decisive for reasonableness determinations," the Department found that two other airports, O'Hare International and Pittsburgh International, had similarly undertaken projects required by a hub airline that increased the costs of other airlines. Id. at 34. Citing the lack of any evidence to the contrary, see id. at 22-23, the Department also found, contrary to the Carriers' argument, that "there is a substantial likelihood" that CIP projects other than the A/D Concourse will be completed, id. at 12, and that "the A/D Concourse will be comparable to the facilities being built for other airlines." Id. The Department also concluded that errors in Dade County's initial fee calculations were irrelevant to whether the fees were allocated reasonably, see id. at 35-36, and rejected the administrative law judge's assignment of the burden of proving reasonableness, concluding that the Carriers should bear the burden because five of them had initiated these legal proceedings by filing suit in district court. In so assigning the burden of proof, the Department observed that "[a]n important factor in our decision on the burden of proof is that our ruling will cause no unfairness for the Carriers given their opportunity to conduct discovery in the district court proceeding." Id. at 17.
 
 II.
 
 16
 The Carriers begin by contending that the Department applied standards that this court recently invalidated as arbitrary and capricious and that do not meaningfully limit fees. But, acknowledging that this contention may not carry the day, they contend that if some of those standards survive, the Department lacked substantial evidence to support its findings that the A/D Concourse is comparable to new facilities planned for other airlines, that Dade County applied its equalization methodology consistently, and that financing of other airports, namely, O'Hare International and Pittsburgh International, is similar to MIA's. Further, the Carriers contend that the Department acted in an arbitrary and capricious fashion in four respects: it relied on the prospect of future construction as proof that all airlines would eventually have comparable facilities but ignored evidence that at least one concourse can never be made comparable to the A/D Concourse; it took issue with the policy decisions of the administrative law judge yet claimed that its Final Order did not set [331 U.S.App.D.C. 295] general policy; it requested findings on MIA's fee calculations but later deemed them irrelevant; and it ignored evidence that MIA's fee allocation would harm competition among airlines. Finally, the Carriers maintain that the Department's decision to place the burden of proof on them was erroneous because the County filed the request for a reasonableness determination and possessed the cost data and other information most relevant to the reasonableness of its fees, and further, that due process requires a new hearing because the Carriers had proceeded on the understanding that they did not bear the burden of proof. Notably, the Carriers make no attack on the equalization methodology itself, only on its application. For the reasons that follow we conclude that the Carriers' contentions fail.
 
 A.
 
 17
 The Carriers contend that the Department failed to apply a legally correct reasonableness standard or, indeed, any discernable reasonableness standard at all. They make three arguments: first, the Department based its orders on an invalid rule; second, the Policy Statement's reasonableness standards provide no restraints on terminal fees; and third, these standards do not comport with the Supreme Court's instructions in Northwest Airlines, 510 U.S. at 355, 114 S.Ct. 855.
 
 
 18
 The Carriers maintain first that a remand is necessary because, in the orders under review, the Department applied the legal standards embodied in the Policy Statement, part of which the court vacated and viewed as providing "no real guidance as to how the Secretary will determine reasonableness." Air Transp. Ass'n, 119 F.3d at 43. Even if an agency adjudication invokes a subsequently vacated rule, however, the adjudication does not automatically become invalid. If a petitioner cannot show any way in which its interests were impaired by the agency's adherence to the rule, the court need not remand in light of that rule's vacation. See Independent U.S. Tanker Owners Comm. v. Lewis, 690 F.2d 908, 920-22 (D.C.Cir.1982). Only one of the three Policy Statement paragraphs upon which the Department relied was vacated, see Air Transp. Ass'n, 129 F.3d at 625, and the Carriers have no substantial argument that this invalidated paragraph so affected the Department's actions as to require a remand. The two surviving paragraphs require airports to apply their fee-setting methodologies consistently to comparable airlines, see Policy Statement, 61 Fed.Reg. at 32019 p 2.1, 32021 p 3.1, while the vacated paragraph included these same consistency and comparability requirements plus the requirement that the airport's methodology be reasonable and justified, see id. at 32020-21 p 2.6. This extra requirement is not relevant in this case, however, for the Carriers conceded in their submissions to the Department and this court that the equalization method is generally a fair way to calculate non-airfield fees; that is, the Carriers do not contest the methodology's reasonableness or justification, only the way it was applied. See Joint Carriers Answer & Brief 5 n.6, 9-10, 16. Consequently, the Department's orders did not depend upon an invalid rule, but rather rested on the comparability and consistency standards embodied in two valid paragraphs of the Policy Statement along with the equalization methodology that the Carriers accepted. Because the vacated paragraph did not affect the Department's decision, any basis for the Carriers' contention that the orders were issued under an invalid rule evaporates. See Independent U.S. Tanker Owners Comm., 690 F.2d at 921-22.
 
 
 19
 Second, the Carriers maintain that the Policy Statement provides no restraint on fees because its standards in general are not based on public utility ratemaking law and economics, and because its comparability and consistency standards are meaningless. The Carriers, however, failed to raise these objections in their submissions to the Department.[11] See Joint Carriers Response to [331 U.S.App.D.C. 296] Judge's Order 14; Joint Carriers Answer and Brief 16. Yet "[n]o objection to ... a final order shall be considered by the court unless objection was urged before an administrative law judge or the Secretary ... unless there were reasonable grounds for failure to do so." 49 U.S.C. § 47129(c)(6). The Carriers contend that they were not required to satisfy this exhaustion provision because the Department received notice of these objections in the earlier proceedings challenging the Policy Statement, see Air Transp. Ass'n, 119 F.3d at 41, and it would have been futile to reargue the same issues.[12] Whether or not these precise objections were raised in the Air Transp. Ass'n proceedings, the Department plainly stated in the Instituting Order that it did not consider the issues raised in those proceedings to be relevant to the MIA fee dispute. See Instituting Order at 4 n.2. The Carriers never objected to this position, instead implying that they agreed with it by accepting the Policy Statement's standards as governing the dispute. See Joint Carriers' Response to Judge's Order 3; Joint Carriers' Brief to Dep't Decisionmaker 14-15, 42-43. Under these circumstances, the Carriers were obliged, in order to avoid "sandbagging" the Department, to alert the Department to their objections to the Policy Statement's degree of restraint on fees and the purported meaninglessness of the "comparability" and "consistency" standards. Cf. USAir, Inc. v. DOT, 969 F.2d 1256, 1260 (D.C.Cir.1992). The Carriers offer no reasons why the Department would not have considered these objections had they been raised. Consequently, we decline to consider them. See 49 U.S.C. § 47129(c)(6).
 
 
 20
 Third, the Carriers maintain that the Department's reasonableness standards must be at least as stringent as those applied by the Supreme Court in Northwest Airlines and must therefore both prohibit excessive cross-subsidies and require cost-benefit analysis. In Northwest Airlines, the Court examined whether fees at Kent County International Airport in Grand Rapids, Michigan, were reasonable under the Anti-Head Tax Act and the Commerce Clause. See Northwest Airlines, 510 U.S. at 358, 114 S.Ct. 855. Observing that the Secretary is better equipped than the courts to determine reasonableness under the Anti-Head Tax Act but had provided no guidance on the subject, the Court applied dormant Commerce Clause jurisprudence[13] to the Anti-Head Tax Act claims and held the fees to be reasonable. See id. at 366-69, 374, 114 S.Ct. 855. The Court stated, however, that should the Secretary determine that "some other formula (including one that entails more rigorous scrutiny)" is preferable, "his exposition will merit judicial approbation so long as it represents 'a permissible construction of the statute.' " Id. at 368 n. 14, 114 S.Ct. 855 (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); see also id. at 366-67, 114 S.Ct. 855. Thus the Court made clear that it was not establishing a standard for reasonableness under the Anti-Head Tax Act, and that the Secretary could establish another standard, whether more or less stringent than the standard the Court adopted in Northwest Airlines, so long as it was a permissible construction of the statute. We need not delve into whether Northwest Airlines requires a cost-benefit analysis or [331 U.S.App.D.C. 297] any other particular study,[14] nor whether the Department's reasonableness standards are consistent with those applied by the Supreme Court in Northwest Airlines, because the Department was not bound to the standards in that case.
 
 B.
 
 21
 Turning to the Carriers' challenges to the Department's findings, we conclude that none of the challenges is persuasive. The Carriers contest the findings that: the A/D Concourse and American's right to use it are comparable to the facilities and rights of use of other airlines; MIA applied its equalization methodology consistently; and O'Hare International and Pittsburgh International airports have built newer or better facilities for hub airlines and charged all airlines the costs of these facilities. The court must defer to the Department's decision if it was reasoned, see City of Los Angeles, Dep't of Airports v. DOT, 103 F.3d 1027, 1031 (D.C.Cir.1997), and must affirm the Department's decision unless it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, see 5 U.S.C. § 706(2)(A) (1994). The Department's findings of fact are conclusive if supported by substantial evidence.[15] See 49 U.S.C. § 47129(c)(6).
 
 
 22
 First, in challenging the Department's determination that the A/D Concourse is comparable to other facilities, the Carriers point to evidence that the A/D Concourse will be bigger and more expensive than the other concourses, will include special features such as a people-mover (a train-like vehicle), moving walkways, larger gates, and access to dual taxiways, will be subsidized by airlines other than American, is dedicated for American's exclusive use under a unique agreement, and includes features that other concourses will never have under the CIP. Further, the Carriers note that there is no agreement guaranteeing the construction of new facilities other than the A/D Concourse. The Carriers supply no evidence contradicting that relied on by the Department, but instead contend that due to these differences, many of which Dade County acknowledges, the A/D Concourse cannot logically be comparable to other concourses.
 
 
 23
 While there is evidence to support many of the Carriers' observations, the Department's finding of comparability is nevertheless based on substantial evidence and reasoned analysis. The Department relied on testimony from a CIP architect, see Test. of Guillermo Carreras, Tr. 571-74; Second Decl. of Carreras 3-5, and an airport planning engineer, see Decl. of Richard Haury 12-13, to conclude that the "A/D Concourse will be essentially comparable with the other new [331 U.S.App.D.C. 298] concourses in terms of size, scope, finish, and furnishings." Final Order at 24. The Department further relied on the CIP architect's testimony, see Test. of Carreras, Tr. 550-55, and that of the representative of USAir, see Test. of Charles Stipancic, Tr. 1577-78, in finding that the "gates contained in all of the new or renovated concourses will be of the same size as much as possible." Final Order at 24. The Department also reasonably concluded that MIA's decision to provide larger gates on the A/D Concourse than are needed to accommodate American's current fleet of aircraft was based on MIA's desire to increase its number of international gates overall and to build gates that could accommodate larger aircraft in the future. See id. at 24-25.
 
 
 24
 The Department found that, except for the baggage sorting system for which American agreed to pay, the features of the A/D Concourse were not "so special or unusual that they should be charged entirely to American." Id. at 27. Specifically, the Department observed that the A/D Concourse will not be the only one with a people-mover, since Concourse E already has one and will receive a better one as part of the CIP, and accepted an airport planning engineer's testimony that this train-like vehicle would be necessary on any concourse as lengthy as the A/D. See id. at 28; Second Decl. of Haury 2-3. The Department also found, based on the same engineer's testimony, see Second Decl. of Haury 5, that the demolition costs associated with the A/D Concourse are typical of airport renovation projects and are normally borne by all airlines. See Final Order at 29. Based on the CIP architect's testimony, the Department found that some concourses other than A/D would have access to dual taxiways. See id. at 29-30; Test. of Carreras, Tr. 483-86. In addition, the Department found that American's right to use the A/D Concourse so long as it maintains an average of 250 daily jet flights should not affect the comparability analysis because at issue is cost allocation, and the rights conferred on American do not entail any costs. Furthermore, American committed to maintain a certain level of service in exchange for these rights, unlike other airlines that made no similar commitments. See Final Order at 31-32.
 
 
 25
 The Department reasoned that comparability of facilities must be assessed over time because the equalization methodology relies on assumptions that different facilities are renovated at different times and that at any point some airlines will be using older facilities than others, but that over time, every airline will obtain new facilities. See id. at 25-26. In other words, once the equalization methodology is adopted, inequalities at any moment in time are inevitable, but eventually every carrier benefits albeit not necessarily to the same exact extent. The Department also concluded that it was unlikely that Dade County would not complete the CIP projects for airlines other than American because: several of those projects are underway and scheduled to be completed before the A/D Concourse; MIA must be expanded to meet traffic needs; and the Carriers presented no evidence to indicate that Dade County will not complete projects other than the A/D Concourse. See id. at 22-23.
 
 
 26
 The difference between the positions of the Carriers and the Department arises largely from their differing perceptions of the meaning of comparability. The Carriers maintain, in essence, that comparable facilities should have similar costs and be of similar overall size. They also maintain that facilities cannot be comparable if an old facility, like Concourse G, is substantially inferior to a new one, or if a facility for one airline is being subsidized by other airlines.[16] These [331 U.S.App.D.C. 299] views, however, clash with the equalization methodology, under which comparability is measured over time, and each airline subsidizes the construction of new facilities for other airlines but then benefits when new facilities are constructed for its main use. Further, facilities for an airline that carries more than half of an airport's passengers must necessarily be more expensive and larger on an absolute basis than those for airlines that carry less than seven percent each of the airport's passengers; evidence of larger size and scope on an absolute basis does not imply disproportionality when passenger traffic and overall fees are taken into account. The Carriers offer no evidence that compares the benefits of the CIP to each airline on a per-fee-dollar basis,[17] a per passenger basis, or any other basis that takes into account the vast differences between the scale of American's operations at MIA and those of other airlines.
 
 
 27
 In contrast, the Department observed that because 80% of terminal fees are based on passenger traffic, American currently pays 40.7% of MIA airline fees and would pay 46.5% after the CIP is completed. The Department also noted that American will pay approximately half of the total costs of the CIP, see Final Order at 31; because the A/D Concourse makes up slightly more than a third of the CIP's total costs according to the County's estimate, see supra note 6, American will bear significant costs for renovations to facilities that it does not use. The Department also emphasized that if, as expected, the increased efficiencies of the A/D Concourse enable American to increase its passenger traffic at MIA, then its terminal fees will increase, and the Carriers' fees will decrease. See Final Order at 20.
 
 
 28
 Although the Carriers' view of the meaning of comparability may be reasonable, there is nothing unreasonable about the Department's alternative view. Given the deference that the court must accord an agency's interpretation of its own regulations, see Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), it follows that the Department's view of the meaning of "comparability" prevails, and given the deference to an agency adjudication inherent in substantial-evidence review, see Allentown Mack Sales & Serv., Inc. v. NLRB, --- U.S. ----, ----, 118 S.Ct. 818, 828, 139 L.Ed.2d 797 (1998), it follows that the Department's finding of comparability is valid.
 
 
 29
 Second, the Carriers challenge the Department's finding that MIA applied the equalization methodology consistently, on the ground that MIA plans to charge American for some specialized facilities it exclusively uses, such as American's enhanced baggage sorting system, but not for other unique features of the A/D Concourse, such as those on the "betterments list," which a consultant developed at MIA's request to itemize arguably unusual features of the A/D Concourse considered to be potential charges to American. The Department determined that the question of whether MIA applied the equalization methodology consistently was premature. See Final Order at 32-33. Because the A/D Concourse had not yet been designed, it was not yet possible to determine which features ought to be charged to American. The Department addressed this analytic difficulty by conditioning its finding of reasonableness on Dade County's applying its methodology consistently. The Department also rejected any use of the "betterments list" as evidence that certain items ought to be charged to American, because the MIA staffer who requested the list stated that it was merely a negotiating tool and because "neither the County government nor the airport's executive officials ever approved the list as a statement of policy on the proper allocation of charges." Id. at 27. Because the question of whether MIA applied the equalization methodology consistently cannot be answered until designs for the A/D Concourse are completed and costs allocated, we conclude that there is nothing unreasonable about the Department's approach.
 
 
 30
 [331 U.S.App.D.C. 300] Third, the Carriers challenge as unsupported by substantial evidence the Department's finding that O'Hare International and Pittsburgh International airports built facilities demanded by hub airlines and imposed some of the costs on other airlines. The Department stated in its Final Order, however:
 
 
 31
 the practices of other airports are not necessarily decisive for reasonableness determinations. Our decision here is based on the specific facts of this case, particularly the airport's need to improve and expand all of its facilities and its plans to build new facilities for most of the airlines at MIA.
 
 
 32
 Final Order at 34-35. Because the Department's findings regarding other airports were not decisive, and because the Department's comparability findings--which were decisive--were supported by substantial evidence, the court need not address this challenge further. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); Salt River Project Agric. Improvement & Power Dist. v. United States, 762 F.2d 1053, 1060 n. 8 (D.C.Cir.1985); Consolidated Gas Supply Corp. v. FERC, 606 F.2d 323, 328-29 (D.C.Cir.1979); 3 CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE § 10.7 (2d ed.1997).
 
 C.
 
 33
 The Carriers further challenge the Department's decision-making as arbitrary and capricious, based on four instances of allegedly illogical or inconsistent reasoning. We disagree.
 
 
 34
 First, the Carriers point to inconsistent reasoning in that the Department stated that it would be concerned if other airlines would pay for much of the cost of a hub airline's new facilities when they would not have comparable facilities, see Final Order at 13, acknowledged that Concourse G, used by Trans World Airlines, Inc. ("TWA") and Air Canada, would not be rebuilt under the CIP and is not currently similar to the A/D Concourse, see id. at 25, and yet, seemingly inconsistently, approved the fees at issue as reasonable. As noted, under the equalization methodology, all airlines share in the costs of renovating all concourses. An underlying assumption of the methodology is that some airlines will have newer or better facilities while others have older or poorer ones, but that, over time, all airlines will receive newer and better facilities. For example, as USAir's representative testified, Concourse H, used by Delta and USAir, will be renovated first, at which time it will be superior to Concourses C, D, and G, but all airlines will share its costs. See Test. of Stipancic, Tr. 1583. Likewise, Concourse F, used by United, is currently superior to Concourse G, and yet all airlines share in its costs. See Prehearing Conf. Tr. 352. As the Department observed:
 
 
 35
 After all, other airlines already have better space than TWA and Air Canada, yet no one has objected to the airport's use of the equalization methodology to charge TWA and Air Canada the same rate as the airlines with the better space. Notably, neither Air Canada nor TWA has challenged the airport's use of the methodology for space which is not as good as the space used by other airlines.
 
 
 36
 Final Order at 25. Although Concourse G will not be rebuilt under the CIP, it will be improved, and a CIP architect testified that it may later be demolished, with TWA and Air Canada moving into Concourse H or some other space newer and better than Concourse G. See Test. of Carreras, Tr. 518-20. Thus, the Department's reasoning regarding Concourse G is consistent with the equalization methodology, which the Carriers acknowledge is generally fair.
 
 
 37
 Second, the Carriers maintain that it was inconsistent for the Department to disagree with the policy views of the administrative law judge regarding when facilities are comparable, see Final Order at 12 n.7, yet elsewhere indicate that its orders were not intended to set general policy on the allocation of costs associated with the construction of new facilities for a hub airline, see id. at 34-35. In stating that it disagreed with the policy views of the administrative law judge, the Department was merely acknowledging that it accepts the premise of the equalization methodology that fees are reasonable if airlines receive new and comparable facilities over time, even when at any given point in time, some airlines have newer and better [331 U.S.App.D.C. 301] facilities than others, while the administrative law judge essentially rejected this view, see ALJ Decision at 65-70. In other words, the administrative law judge erred, for example, in finding that MIA's fees cannot be reasonable so long as the A/D Concourse will be better than Concourse G. See Final Order at 25. In disclaiming that it was setting broad policy, the Department was simply stating that reasonableness determinations would be made based on the specific facts of each case, and that it was not endorsing any general fee practice. We are unpersuaded that its statements are inconsistent.
 
 
 38
 Third, the Carriers maintain that the Department capriciously shifted position, first directing the administrative law judge to make findings on the validity of the fee calculation, see Instituting Order at 23, but then ruling this issue irrelevant when Dade County acknowledged errors in its calculations, see Final Order at 35-36. The Department explained, however, that the administrative law judge had misconstrued its Instituting Order, which also directed consideration only of issues raised in the parties' pleadings. See Final Order at 35. Although the Carriers did refer to flaws in the cost data, see Joint Carriers' Answer & Brief 25-26, 32 n.30, 37, they did so in the context of making general arguments that Dade County was improperly requesting an advisory opinion on future rates and that the financing of the A/D Concourse was unlike development projects at other airports or previous projects at MIA. They did not make a general claim that the fees were unreasonable because they were miscalculated. As a result, the Department concluded that only the allocation of the fees, not their calculation, was at issue, and the calculation errors were irrelevant. See Final Order at 36. Additionally, the Department concluded, and the Carriers do not dispute, that the calculation errors meant only that too large a share of the A/D Concourse costs was attributed to landing fees and too little a share to terminal fees. See id. The Carriers have offered no argument why the court should reject the Department's interpretation of their initial submissions or its conclusions as to the lack of prejudice from the error in calculations. See 5 U.S.C. § 706. Thus, there is no basis to find the Department's treatment of the fee calculation errors to be arbitrary and capricious.
 
 
 39
 Fourth, the Carriers maintain that the Department ignored evidence and arguments on the impact of the fee allocation on competition among airlines. Construction of the A/D Concourse will increase American's efficiency, resulting in shorter time periods between connecting flights, which will make American more desirable to airline customers. The Carriers contend that fees cannot be reasonable where they force airlines to pay for renovations to enhance the efficiency of their competitors. Yet this argument is simply another way to state the Carriers' position that fees cannot be reasonable when one airline subsidizes renovations to benefit another. Because renovations, improvements, and reconfigurations of facilities will likely increase the efficiency of the airlines using them, as the new people-mover planned for Concourse E will increase the efficiency of airlines using that concourse, any fee allocation based on the equalization methodology will necessarily force airlines to subsidize projects that increase their competitors' efficiency.
 
 D.
 
 40
 Finally, the Carriers contend that the Department erred in placing the burden of proving reasonableness on them and denied them due process by assigning this burden to them in mid-proceeding without allowing them to submit new arguments or evidence. The administrative law judge placed the burden of proof on Dade County, as the requestor of the reasonableness determination, because the proponent of a rule or order generally has the burden of proof under the Administrative Procedure Act ("APA"), see 5 U.S.C. § 556(d) (1994); Director, Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 272, 114 S.Ct. 2251, [331 U.S.App.D.C. 302] 129 L.Ed.2d 221 (1994), and the administrative law judge saw no good reason for assigning this burden differently. The administrative law judge also thought placing the burden on the Carriers would be unfair to them because the requesting party, here Dade County, has sixty days following the notice of imposition of fees to file a request and may frame arguments and submit evidence in both a requesting brief and a reply brief, while the answering party, here the Carriers, has but fourteen days from the filing of the requestor's initial filing to file its only submission. See 14 C.F.R. §§ 302.603(b), 302.607(c), 302.609(a) (1998).
 
 
 41
 The Department rejected the administrative law judge's analysis, concluding that the Carriers should bear the burden of proof because they initiated the legal dispute by filing suit in district court and, thus, Dade County is in the position of "requestor" only because the district court directed the parties to seek review under 49 U.S.C. § 47129.[18] See Final Order at 16-17. The Department explained, however:
 
 
 42
 An important factor in our decision on the burden of proof is that our ruling will cause no unfairness for the ... Carriers. They began the litigation over the airport's fees, they were able to conduct discovery in the district court proceeding, and they have known since the district court issued its order in November 1996 that the fee issue would be litigated in an administrative forum. The ... Carriers accordingly have had ample opportunity to prepare their case in response to the airport's request for a determination. This is not a case where the airlines had neither notice that there would be litigation over the reasonableness of an airport's fees nor an opportunity to investigate the airport's documentation for the fees in dispute.
 
 
 43
 Id. at 17.
 
 
 44
 Without implying that a mid-course change in the assignment of the burden of proof can produce anything other than problems, and is hardly a preferred method of procedure, the circumstances leading to the filing of Dade County's request are unusual, effectively placing the Carriers in the position of the requestor in the instant case, and therefore the bearer of the burden of proof. Because the district court directed the parties to take appropriate action under § 47129 to submit the claim to the FAA, the agency proceeding was essentially a continuation of the Carriers' lawsuit.[19]
 
 
 45
 But even if the Department erred in making a mid-course change in assignment of the burden of proof, the Carriers show no prejudice as a result. As incorporated into the APA, the harmless error rule requires the party asserting error to demonstrate prejudice from the error. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error.") (emphasis added); Doolin Sec. Savings Bank, F.S.B. v. OTS, 139 F.3d 203, 212 (D.C.Cir.1998) (citing U.S. DEP'T OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 110 (1947), reprinted in ADMINISTRATIVE CONFERENCE OF THE UNITED STATES, FEDERAL [331 U.S.APP.D.C. 303] ADMINISTRATIVE PROCEDURE SOURCEBOOK 67, 176 (2d ed.1992)); cf. Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1214 (D.C.Cir.1997). While the Carriers contend that they were prejudiced when the Department placed the burden of proof on them because they tailored their case to their initial understanding of the burden, they fail to explain how they were harmed. When questioned twice during oral argument about what specifically the Carriers would have done differently had they known at the outset of the agency proceedings that they bore the burden of proof, the Carriers' attorney answered twice that they would have cross-examined the Dade County witness who acknowledged errors in the fee calculations and that they would have presented evidence about how other airports calculate their fees. Because neither of these issues was essential to the Department's determination of reasonableness, the Carriers fail to show they were prejudiced because they could not explore them further.
 
 
 46
 Likewise unpersuasive is the Carriers' contention that they were prejudiced because, as the answering party, they were permitted to file only one submission while the County filed two, and had only fourteen days to file their submission while the County had sixty days. They point to no evidence or arguments they would have made with the additional submission and time. The Department's regulations required the Carriers to put forth all arguments and evidence in their answer to Dade County's request. See 14 C.F.R. § 302.607(b). Hence, their arguments and evidence presumably would have been virtually the same regardless of whether they knew that they bore the burden of proof. Indeed, the administrative law judge expressly noted in his opinion that which party had the burden of proof was irrelevant to the ultimate determination. Additionally, as the Department noted, the Carriers had ample time for discovery in the district court proceedings and knew from the time of the district court's order that they would have to present their evidence against the reasonableness of the fees in an administrative proceeding. See Final Order at 17.
 
 
 47
 Further, although the Carriers assert that the burden of proof assignment was outcome-determinative, they do not explain why or how. This assertion rests on a single footnote in which the Department states that its disagreement with the administrative law judge's comparability determination "largely results from our different policy views, our conclusions on the burden of proof, and our analysis of the airport's fee structure and [CIP]." Final Order at 12 n.7. But this sentence alone cannot suffice to demonstrate prejudice to the Carriers because it does not indicate that the Department would have found the fees to be unreasonable had it reached a different conclusion on the burden of proof, nor does it indicate that the Department concluded that the Carriers failed to put forth a prima facie case of the unreasonableness of MIA's fees. See Final Order at 17.
 
 
 48
 Finally, the burden of proof could hardly be outcome-determinative in the instant case because the Department's conclusions did not turn on evidence or the lack thereof. The Department relied on the parties' acceptance of both the Policy Statement and the general fairness of the equalization methodology in determining what legal standard to employ. The Department found that the A/D Concourse was comparable to other concourses by applying that methodology to largely undisputed evidence. The Department concluded that it would be premature to make any determination of whether MIA applied its fee methodology consistently, but conditioned its Final Order on consistent application. While the Department's conclusion regarding the financing of different airports was based on disputed facts, it was unimportant to the Department's ultimate decision.
 
 
 49
 Undoubtedly, there generally should be clarity at the outset of an administrative proceeding regarding where the burden of proof will lie, and some assurance that it will remain there while the matter is before the agency. The unusual circumstances giving rise to the filing of Dade County's request may explain what happened here. In any event, given the Department's evidentiary and procedural regulations requiring parties to put forth all of their evidence at the [331 U.S.App.D.C. 304] outset, see 14 C.F.R. §§ 302.605(a), 302.607(b), and the Department's notice directing the parties to so proceed, see Instituting Order at 23, after the Carriers had obtained considerable discovery during the pendency of the district court proceeding, the Carriers now would have to demonstrate actual prejudice. The Carriers have made no such showing.
 
 
 50
 Accordingly, because the Department applied a valid and ascertainable legal standard, and the Carriers failed to demonstrate that the Department's decision was arbitrary, capricious or unsupported by substantial evidence or that they were prejudiced by the Department's decision to place the burden of proof on them, we deny their petitions.
 
 
 
 [1]
 Miami Int'l Airport Rates Proceeding, No. OST-96-1965, DOT Order 96-12-23 (Dec. 19, 1996) [hereinafter "Instituting Order"], and DOT Order 97-3-26 (Mar. 19, 1997) [hereinafter "Final Order"]
 
 
 [2]
 The Carriers are Air Canada, Delta Airlines, Inc., Lufthansa German Airlines, Trans World Airlines, Inc., United Air Lines, Inc., and U.S. Airways, Inc. Three entities other than the Department have filed briefs in support of the orders: as intervenors, Dade County and American Airlines, Inc., and as amicus curiae, the Airports Council International-North America, a trade association representing the government bodies that own and operate the principal United States airports served by scheduled carriers
 
 
 [3]
 The Secretary has delegated his authority under 49 U.S.C. § 47129 to the Assistant Secretary for Aviation and International Affairs. See 49 C.F.R. § 1.56a(i) (1997). For the purposes of this opinion, we refer to the ultimate agency decisionmaker under 49 U.S.C. § 47129 as the "Department" or the "Secretary."
 
 
 [4]
 "Airports collect the bulk of their revenues from two general groups of users: aeronautical users, such as commercial (passenger) airlines, and non-aeronautical concessionaires, including car rental agencies, parking lots, restaurants, gift shops, and other small vendors." Air Transp. Ass'n, 119 F.3d at 39 n. 1
 
 
 [5]
 American will only have a month-to-month lease on terminal facilities such as ticket counters
 
 
 [6]
 Dade County and the Carriers dispute the cost of the A/D Concourse. The County asserts that renovation of the whole terminal building will cost $2.8 billion, with $975 million designated for the A/D Concourse and $1.8 billion for improvements to other concourses. See Decl. of Van Wezel 5. The Carriers maintain that the costs attributable to the A/D Concourse will reach almost $1.7 billion. In addition to this disputed amount that will be divided among all airlines under the equalization methodology, American plans to spend $60 million on its own for an enhanced baggage sorting system and $90 million for communications equipment, furniture, fixtures, and finishes for its VIP lounge and other facilities. See Decl. of Frank R. Erickson 18
 
 
 [7]
 Section 47129 provides in pertinent part:
 The Secretary of Transportation shall issue a determination as to whether a fee imposed upon one or more air carriers ... is reasonable....
 49 U.S.C. § 47129(a)(1).
 
 
 [8]
 The Carriers do not challenge this decision
 
 
 [9]
 Although aware that other parties had petitioned for review of the Policy Statement, the Department concluded that "[t]he issues ... raised by those parties do not involve the issues raised" by the Carriers. Final Order at 4 n.3. This court did not issue its decision vacating certain portions of the Policy Statement until more than four months after the Department issued this order
 
 
 [10]
 The Department placed two conditions on this determination: American's obligation to pay the cost of its enhanced baggage system must be unlimited; and, consistent with its equalization methodology, Dade County must charge American the cost of terminal facilities it exclusively uses. See Final Order at 37
 
 
 [11]
 The Carriers did argue to the Department and this court that the A/D Concourse and American's right to use it are not comparable to the facilities used by and rights of other airlines. See Joint Carriers Answer & Brief 57-58. Because this argument is not an objection to the validity of the legal standards but instead to their application, we address those arguments in our discussion of whether the Department's orders were based on reasoned decisionmaking. See infra section II.B
 
 
 [12]
 Like many statutes that contain similar exhaustion provisions, Section 113 of the Federal Aviation Administration Authorization Act of 1994 codifies the judicial doctrine of exhaustion of administrative remedies. See 49 U.S.C. § 47129(c)(6); Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 681-82 (D.C.Cir.1983). This doctrine permits courts to waive exhaustion requirements in certain circumstances, including when the agency has considered an argument after another party raised it and when raising the argument before the agency would have been futile. See id. at 682 & nn. 9-10
 
 
 [13]
 Under the dormant Commerce Clause, a fee is reasonable "if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." Northwest Airlines, 510 U.S. at 369, 114 S.Ct. 855 (citing Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc., 405 U.S. 707, 716-17, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972))
 
 
 [14]
 In any event, the Carriers cannot accept the equalization methodology as generally reasonable and yet at the same time insist on a prohibition on cross-subsidies and a cost-benefit analysis of the CIP because these concepts are meaningless under an equalization methodology. The Carriers have not shown how these two positions are consistent. Because facilities are renovated at different times, some airlines will always be subsidizing improvements to facilities used by other airlines. Likewise, a cost-benefit analysis for a renovation project will naturally show that the airline whose facility is being improved by that project receives benefits that exceed costs. While it would be unreasonable for one airline exclusively and consistently to receive much greater benefits than others without bearing greater costs as well, the Carriers have not demonstrated that such an imbalance exists at MIA. See infra section II.B. Whether or not the Policy Statement provides so little guidance as to allow such an imbalance under a different set of facts is a question left for another day, because the Policy Statement is presently on remand to the Secretary. See Air Transp. Ass'n, 119 F.3d at 45, amended by 129 F.3d at 625
 
 
 [15]
 The Carriers suggest that the court should review the Department's findings under a less deferential standard because the Department overturned findings made by the administrative law judge. The Supreme Court instructs, however, that the substantial evidence standard is not modified in any way when an agency and an administrative law judge disagree; instead, where credibility of witnesses is at stake, an administrative law judge's evaluation of the witness' testimony may be an indicator of the substantiality of the evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 496-97, 71 S.Ct. 456, 95 L.Ed. 456 (1951); see also Chen v. GAO, 821 F.2d 732, 734 (D.C.Cir.1987); National Ass'n of Recycling Indus., Inc. v. Federal Maritime Comm'n, 658 F.2d 816, 824-25 (D.C.Cir.1980). Ultimately, where there is substantial evidence supporting its results, the Department's view governs. See Greater Boston Television Corp. v. FCC, 444 F.2d 841, 853 (D.C.Cir.1970)
 
 
 [16]
 Although decrying cross-subsidies in general, the Carriers produced no evidence of cross-subsidization. Their sole expert witness on this topic estimated that airlines other than American would pay twelve to forty-eight million dollars more in annual fees if the A/D Concourse were constructed than if it were not. See Decl. of Daniel P. Kaplan 6-7. Even if true, this assertion does not establish the existence of a "subsidy" because it does not compare American's contributions to the costs of renovating other airlines' facilities with other airlines' contributions to the costs of the A/D Concourse, and it does not take into account the increase in American's fees--and consequent decrease in other airlines' fees--that will result from an increase in American's passenger traffic. Further, the Carriers have not demonstrated that American did not subsidize their operations in the past, when its facilities were less modern than those for other airlines such as USAir. See Final Order at 19-20
 
 
 [17]
 The Carriers submitted no such analysis, and indeed, their expert witness complained about the failure of the County's expert to do so. See Decl. of Kaplan 9
 
 
 [18]
 The Department observed in the Final Order that:
 [T]his case is unusual because of the circumstances giving rise to the filing of Dade County's request. In our view, if an airport imposes a new or increased fee and then files a request with us for a determination under 49 U.S.C. 47129 that the fee is reasonable, the airport would generally bear the burden of proof in support of its request.... When an airport seeks an affirmative determination by us as to a fee's reasonableness and validity, and no airline complaint is simultaneously filed, we see no unfairness in placing the burden of proof on the airport. Moreover, we would expect the airport to be prepared in such a case to demonstrate the fee's reasonableness....
 Final Order at 17.
 
 
 [19]
 Metropolitan Stevedore Co. v. Rambo, 117 S.Ct. 1953 (1997), is not to the contrary, inasmuch as there was no initial determination here that Dade County sought to modify and the Carriers filed suit in the district court where they clearly bore the burden of proof